**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| ECHOSTAR SATELLITE, L.L.C. | : | |
| | : | |
| Plaintiff, | : | Civil Action No. 06-5567 (SDW) |
| | : | |
| v. | : | **OPINION** |
| | : | |
| GLOBE STAR L.L.C. and | : | |
| DIRECTV, INC. | : | August 20, 2009 |
| | : | |
| Defendants. | : | |

**WIGENTON**, District Judge.

Plaintiff EchoStar Satellite L.L.C. ("EchoStar") filed a complaint on November 20, 2006, against Defendant Globe Star L.L.C. ("Globe Star") for breach of contract and against Defendant DIRECTV, Inc. ("DIRECTV") for tortious interference with EchoStar's contractual relationship with Globe Star. Before the Court is DIRECTV's Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56(b). DIRECTV argues, inter alia, that there was no contractual relationship between Globe Star and EchoStar at the time of its negotiations with Globe Star and even if there was, it was not aware of it. Thus, DIRECTV agues that the tortious interference claim must fail as a matter of law. This Court has jurisdiction pursuant to 28 U.S.C. 1332(a). The Motions are decided without oral argument pursuant to Federal Rule of Civil Procedure 78.

## I.    Factual Background[1]

EchoStar and DIRECTV are two of the nation's leading direct broadcast satellite systems. EchoStar operates under the trade name DISH Network. (Compl. ¶ 7.) Both companies provide a broad range of programming to millions of customers in the United States.

---

[1] The following facts are undisputed by the parties for the purpose of the pending Motion to Dismiss only.

Mega Cosmos is a popular international channel carrying Greek-language programming owned by Teletypos, a Greek company.  (Def.'s 56.1 Statement ¶ 6 (hereinafter "Def.'s 56.1").)

Teletypos granted the rights to distribute Mega Cosmos in the United States to Unitel Hellas, SA ("Unitel").  (Def.'s 56.1 ¶ 8.)  On or about August 31, 2001, Globe Star obtained the rights to distribute Mega Cosmos in the United States from Unitel.  (*Id.* ¶ 8.)  Thereafter, pursuant to a December 22, 2002, Affiliation Agreement, Globe Star granted EchoStar the exclusive satellite TV distribution rights for Mega Cosmos in the United States. (Pl.'s 56.1 ¶ 7.) At that time, Globe Star only had rights to distribute Mega Cosmos until July 7, 2004.  (Def.'s 56.1 ¶ 10.)  In January, 2004, Globe Star secured rights to Mega Cosmos until July 1, 2007, and informed EchoStar via e-mail.  (Pl.'s 56.1 ¶¶ 13–14.)

### A.   The agreement between EchoStar and Globe Star

On September 13, 2004, EchoStar and Globe Star entered into a First Amended Affiliation Agreement (the "Agreement"), which allowed EchoStar to continue broadcasting Mega Cosmos until January 1, 2006.  (*Id.* ¶ 15.)  Section 6.1(b) of Exhibit A to that Agreement states:

> On or before January 1, 2006 Network [Globe Star] shall notify EchoStar both verbally and in writing whether it has secured the ability to grant the Programming Service Rights [to Mega Cosmos] through January 1, 2008 . . . .  In the event Network [Globe Star] has secured the Programming Service Rights in accordance with the foregoing, EchoStar shall have the right to renew this Agreement through January 1, 2008 and shall inform Network [Globe Star] if it elects to exercise such right by January 30, 2006."

(Ecklund Decl. Decl., Ex. 19 at ES000072.)

In late February or early March, 2005, Georgia Dumas, Globe Star's Director of Operations, verbally notified Tracy Thompson, EchoStar's Vice President of International Programming, that Globe Star had secured the rights to Mega Cosmos beyond January 1, 2008.

(Pl.'s 56.1 ¶ 20.)  In response to this verbal notification, Thompson sent a letter dated March 3, 2005, to Dumas exercising EchoStar's rights under Section 6.1(b) of Exhibit A to the Agreement and extending EchoStar's rights to Mega Cosmos until January 1, 2008.  (Pl.'s 56.1 ¶ 21; Def.'s 56.1 ¶ 19; Ecklund Decl. Ex. 7.)   The letter states that "when counter-executed by a duly authorized director or officer of Globe Star, this letter shall further extend the Term of the Agreement through and including December 31, 2008."  (Ecklund Decl. Ex. 7.)  There is no evidence that Dumas ever directly acknowledged this letter.  In May, 2005, EchoStar requested a "proof of rights letter," to confirm Globe Star had the rights to Mega Cosmos.  (Def.'s 56.1 ¶ 20.)  A June 1, 2005, letter from Teletypos, the owner of Mega Cosmos, which is addressed to "To Whom it May Concern," states that Globe Star has the exclusive rights to distribute Mega Cosmos until July, 2007.  (Wolin Certif. Ex. 13.)  Caitlin Quattromani, EchoStar's Director of International Programming, testified that she did not recall receiving this letter.  (Ecklund Decl. Decl. Ex. 66 at.151–52.)  On October 24, 2005, Dumas sent an e-mail to Quattromani stating that Globe Star's rights to Mega Cosmos extended until the end of 2010.  (Ecklund Decl. Ex. 8.)

Despite Thompson's March 3, 2005 letter to Dumas, e-mails from EchoStar to Globe Star in late 2005 refer to their Agreement as expiring on January 1, 2006.   One e-mail dated November 9, 2005, from Quattromani of EchoStar to Dumas at Globe Star states:

> "As you know, our current contract expires on 1/1/06.  We would prefer to simply extend through 2010 if we can finalize the contract next week. However, if you don't believe we can finalize a contract next week, we'd like to at least extend through 12/31/07 to allow us time to finalize a longer term deal through 2010."

(Wolin Certif. Ex. 15.)  In another e-mail to Globe Star dated December 13, 2005, Quattromani wrote that "[a]t this point, our current contract expires 1/1/06.  We cannot go out of contract on this and must have an extension in place this week."  (Wolin Certif. Ex. 16.)  A series of e-mails

between EchoStar and Globe Star ranging from January, 2006 to October, 2006, demonstrate that EchoStar negotiated a series of 30 and 45-day extensions to their Agreement with Globe Star while the details of a longer-term agreement were negotiated. (Wolin Certif. Exs. 17–27.) For example, in one e-mail to Dumas dated May 15, 2006, Quattromani stated:

> "As we were unable to resolve the contract today, we must have an extension. If Globestar is unwilling to grant EchoStar a 6 month extension, we would request a 45 day extension through June 30th, 2006. Please note that we cannot continue to operate like this going forward: we must have extensions in place in advance of the expiration date. **Otherwise we are out of contract and have to initiate take down procedures for the channel**."

(Wolin Certif. Ex. 21.) (emphasis in original). Quattromani testified that she was mistaken when she referred to January 1, 2006, as the expiration date because she had forgotten about the March 3, 2005, letter from Thompson (Pl.'s 56.1 ¶ 102.) Thompson, who is copied on many of the e-mail exchanges, also testified that she had forgotten about her March, 2005, renewal letter to Globe Star during the negotiations. (*Id*. ¶ 101.)

### B.   DIRECTV's Negotiations with Globe Star

On April 8, 2004, DIRECTV met with Dumas of Globe Star regarding the rights to Mega Cosmos and ERT, another Greek channel. (Pl.'s 56.1 ¶43.) In an internal DIRECTV e-mail dated August 4, 2005, from Lisa Coelho, DIRECTV's Director of European Programming and Marketing to Mutaz Alshuaibi, a marketing manager for DIRECTV, Coelho discusses Dumas, stating that "the only rights she currently has are to MEGA who is currently on Echo and has another year and a half or so. I told her we would be interested in talking to her in a year or so, but we would not speak to her before then." (Coelho Decl. Ex. C.) There were no further discussions between Globe Star and DIRECTV regarding Mega Cosmos until 2006 (Def.'s 56.1 ¶ 32.)

4

In Early 2006, Dumas told DIRECTV that Globe Star's agreement with EchoStar had expired and that EchoStar was broadcasting Mega Cosmos on a month-to-month basis.  (*Id*. ¶ 33.)  DIRECTV met with Dumas in late April, 2006, to discuss the rights to Mega Cosmos.  (*Id* ¶ 34).  Dumas testified that at that meeting, she told DIRECTV that EchoStar's rights had expired on January 1, 2006.  (Wolin Certif. Ex. 7, 135:21–136:4.)  As negotiations continued, Globe Star assured DIRECTV both verbally and in writing that its agreement with EchoStar had expired.  (Def.'s 56.1 ¶ 35.)   In fact, in July, 2006, Dumas forwarded DIRECTV a chain of e-mails between her and Thompson of EchoStar in which Thompson stated "[t]he bottom line is that we need a decision from Mega on whether they want to stay with DISH network.  We want them to, but cannot continue with these short extensions."  (Wolin Certif. Ex. 24.)  In an earlier e-mail from the same e-mail chain sent to DIRECTV, Dumas tells Thompson that "[y]ou could have a 45 day extension on Mega.  Since this is not an automatic renewal we have to do this every time on expiration."  (*Id*.)

EchoStar was aware in June, 2006, that DIRECTV was in negotiations with Globe Star regarding the rights to Mega Cosmos.  (Plf.'s Resp. 56.1 ¶ 36.)  In October, 2006, DIRECTV and Globe Star entered into a binding term sheet granting DIRECTV the rights to broadcast Mega Cosmos.  (Def.'s 56.1 ¶ 40.)  EchoStar did not contact DIRECTV to protest the negotiations or the term sheet agreement with Globe Star until November 3, 2006.  EchoStar filed the current lawsuit seventeen days later.

## II.    Standard for Summary Judgment Under Rule 56

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The "mere

existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48 (1986). A fact is only "material" for purposes of a summary judgment motion if a dispute over that fact "might affect the outcome of the suit under the governing law." *Id.* at 248. A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The dispute is not genuine if it merely involves "some metaphysical doubt about the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the non-moving party to carry its burden of proof. *Celotex Corp. v. Catrett,* 477 U.S. 317, 318 (1986). Once the moving party meets its initial burden, the burden then shifts to the non-movant who must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of its pleadings. *Shields v. Zuccarini,* 254 F.3d 476, 481 (3d Cir. 2001). "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crafting Co.,* 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson,* 477 U.S. at 255).

In order to defeat DIRECTV's motion, EchoStar "must introduce more than a scintilla of evidence showing that there is a genuine issue for trial; [it] must introduce evidence from which a rational finder of fact could find in [its] favor." *Woloszyn v. County of Lawrence*, 396 F.3d

314, 319 (3d Cir. 2005) (citing *Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1020 (3d

Cir.1991)).  In *Anderson*, the Supreme Court stated:

> The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.  The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict. . . .

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## III.   Discussion

### A.   Tortious Interference with Contractual Relations

In order to establish its claim for tortious interference with contractual relations, EchoStar

must prove: "(1) actual interference with a contract; (2) that the interference was inflicted

intentionally by a defendant who is not a party to the contract; (3) that the interference was

without justification; and (4) that the interference caused damage."  *Dello Russo v. Nagel*, 358

N.J. Super. 254, 268–269 (App. Div. 2003) (citing *Printing Mart-Morristown v. Sharp Elecs.

Corp.*, 116 N.J. 739, 751–752 (1989)).  As the New Jersey Appellate Division has explained:

> The interference is considered intentional if the actor desires to bring it about or if he knows that the interference is certain or substantially certain to occur as a result of his action.  However, the fact that a breaching party acted to advance [its] own interest and financial position does not establish the necessary malice or wrongful conduct.  A claim for tortious interference with the performance of a contract must be based, in part, on facts claiming that the interference was done intentionally and with 'malice.'

*Id.*  (citations and internal quotations omitted); *see Printing Mart-Morristown v. Sharp Elecs.

Corp.*, 116 N.J. 739, 771–772 (1989) (defining malice—as used in the separate tort of intentional

interference with a prospective contractual or economic relationship—to mean "that the harm

was inflicted intentionally and without justification or excuse.")

1) *Existence of a Contract*

A fundamental element of a claim of tortious interference with a contract is the existence of a contract.  *See Carpet Group Intern. v. Oriental Rug Importers Ass'n, Inc.*  256 F. Supp. 2d 249, 288 (D.N.J. 2003).  DIRECTV argues that it cannot, as a matter of law, be held liable for tortious interference with EchoStar's Agreement with Globe Star because that Agreement expired before its 2006 discussions with Globe Star began.  DIRECTV argues that the Agreement expired on January 1, 2006, because the conditions required to trigger the renewal provision of the Agreement were not met.  In order for EchoStar to extend its rights to Mega Cosmos beyond January 1, 2006, the renewal provision of the Agreement required that (1) by January 1, 2006, Globe Star inform EchoStar "both verbally and in writing" that it had secured the rights to Mega Cosmos through January 1, 2008; and that (2) EchoStar inform Globe Star of its exercise of the right to renew by January 30, 2006.  (Ecklund Decl. Ex. 19 at ES000072.)

DIRECTV argues that the requirements of the renewal provision were not met because when EchoStar sent the March, 2005, letter exercising its rights to renew, EchoStar had only provided verbal, not written confirmation that it had secured the rights to Mega Cosmos. DIRECTV also argues that Dumas' October, 2005, e-mail to EchoStar stating that Globe Star had the rights to Mega Cosmos until 2010 was insufficient to trigger the renewal provision because: (1) it was received long after EchoStar's March, 2005, letter; and (2) at that time, Unitel had not secured rights to Mega Cosmos beyond January 1, 2008, and hence could not have granted Globe Star greater rights than it actually had.  (Def.'s Resp. 56.1 ¶ 24.)  Finally, as further evidence that the Agreement had not been renewed, DIRECTV points to various e-mail exchanges between Globe Star and EchoStar in which EchoStar references January 1, 2006, as the Agreement's expiration date and requests short-term extensions.

EchoStar argues that the conditions of the renewal provision were met as soon as Dumas sent the October, 2005 e-mail, even though those conditions happened in a different sequence than arguably contemplated by the Agreement.  EchoStar also argues that because the conditions were met, the Agreement was renewed and valid until January 1, 2008, despite e-mails from EchoStar acknowledging the January 1, 2006, expiration date and requesting short-term extensions once that date had passed.  In support of this argument, EchoStar cites to the testimony of Thompson and Quattromani, who both said they forgot about the renewal letter during the negotiations with Globe Star.  This is razor-thin evidence, but arguably presents more than "some metaphysical doubt about the material facts."  *Matsushita,* 475 U.S. at 586.  This is an example of where drawing "all justifiable inferences" in EchoStar's favor tips the scales and leads this Court to conclude that a genuine issue of material fact exists regarding whether a contract existed between EchoStar and Globe Star after January 1, 2006, for the purposes of EchoStar's tortious interference claim.  *See Marino v. Indus. Crafting Co.,* 358 F.3d 241, 247 (3d Cir. 2004) (citing *Anderson,* 477 U.S. at 255).[2]

2) *Specific Knowledge of a Contract*

The inquiry does not end there, however.  In order to establish its tortious interference claim against DIRECTV, EchoStar must also prove that DIRECTV had specific knowledge of the Agreement EchoStar had with Globe Star.  *See DiGiorgio Corp. v. Mendez and Co.,*, 230 F. Supp. 2d 552, 564 (D.N.J. 2002) ("General knowledge of a business relationship is not sufficient; the defendant must have specific knowledge of the contract right upon which his actions infringe.").  EchoStar does not dispute that Dumas contacted DIRECTV in 2006 and

---

[2] Nothing in this Opinion should be construed as questioning the veracity of EchoStar's breach of contract claim against Globe Star.  It is clear that EchoStar and Globe Star had *some* form of agreement(s) after January 1, 2006, even on a month-to-month basis.  The exact terms of those agreement(s), and whether Globe Star breached them, is not an issue here.

explained that Globe Star's Agreement with EchoStar had expired and that EchoStar was broadcasting Mega Cosmos on a month-to-month basis.  (Pl.'s Resp. 56.1 ¶ 33.)  Nor does it dispute that Globe Star "repeatedly assured DIRECTV—both orally and in writing—that its Agreement with EchoStar had expired."  (*Id*. ¶ 35.)  Globe Star even forwarded DIRECTV an e-mail from EchoStar in which EchoStar acknowledges that the Agreement had expired and that the companies were working off short-term extensions.

EchoStar argues that despite assurances from Globe Star that its Agreement with EchoStar ended in January, 2006, DIRECTV was aware that the Agreement had been extended until 2008.  In support of this contention, EchoStar cites an e-mail from June, 2005, in which DIRECTV was told by an "industry source" that EchoStar had the rights to Mega Cosmos "for another three years minus a few months."  (Pl.'s 56.1 ¶ 55.)  EchoStar also cites to internal DIRECTV communications suggesting that representations made by Dumas at Globe Star were not to be trusted.  (*Id*. ¶ 52.)  In addition, EchoStar relies on a internal DIRECTV memo dated July 14, 2005, indicating that EchoStar had an exclusive contract for the rights to Mega Cosmos "for the next eighteen months" (January, 2007).  (Ecklund Decl. Ex. 30.)

However, in or around August, 2005, DIRECTV severed communications with Globe Star regarding Mega Cosmos and did not discuss it again until March, 2006.[3]   In April, 2006, Dumas of Globe Star contacted DIRECTV and said that their Agreement with EchoStar had expired.  She confirmed this in a face-to-face meeting with Globe Star that same month.  In July, 2006, Dumas forwarded DIRECTV e-mails from EchoStar in which EchoStar requested short-

---

[3] EchoStar denies that DIRECTV broke off communications with Globe Star in 2005 after it learned that the EchoStar still had the rights to Mega Cosmos.  (Pl.'s Resp. 56.1 ¶31.)  In support of this denial, EchoStar refers to paragraphs 40 to 97 of its own 56.1 Statement.  None of these statements cite to any evidence indicating that DIRECTV continued to negotiate with Globe Star regarding Mega Cosmos between approximately August, 2005, and March or April, 2006, when Dumas explicitly told them, verbally and in writing, that Globe Star's contract with EchoStar had expired.  To that end, EchoStar admits that after the 2005 discussions, "[no] further discussions took place between DIRECTV and Globe Star regarding Mega Cosmos until March 2006.  (Pl.'s Resp. 56.1 ¶ 31.)

term extensions to the Agreement and asked whether Mega Cosmos wanted to stay with EchoStar.

EchoStar has cited no evidence originating after January 1, 2006, to suggest that DIRECTV knew that EchoStar's Agreement with Globe Star had been extended to January 1, 2008.   Dumas explicitly told them this was not the case.   EchoStar argues that because DIRECTV was aware of Dumas' "propensity to misrepresent Globe Star's programming rights and obligations, the burden was clearly on DIRECTV to contact EchoStar to confirm the contract expiration date." (Pl.'s Br. 18 n.8.)  This argument fails for two reasons.  First, EchoStar has not cited to any law to support the proposition that DIRECTV, when presented with repeated and direct assurances from GlobeStar that its contract with EchoStar had expired, still had an obligation to contact EchoStar—its direct competitor—to confirm the veracity of those representations.  In fact, there is law to the contrary.  Although not binding on this Court, this Court is persuaded by the D.C. Circuit's explanation that "a party, when told by a prospective client [or, as here, a licensor] that there is no conflicting contract, cannot be held to have knowledge that a binding agreement does in fact exist, at least in the absence of independent evidence of such knowledge." *Tuxedo Contractors, Inc. v. Swindell-Dressler Co*. 613 F.2d 1159, 1164 (D.C. Cir. 1979).  The only independent evidence DIRECTV had of an Agreement between Globe Star and EchoStar came from an "industry source" in 2005.  This information was directly refuted when, in April, 2006, Dumas told DIRECTV that the Agreement had expired. "Awareness that a contract once existed is insufficient if reasonable assurances are received that there can no longer be any interference with it."  *Id*.  There is no question that DIRECTTV received reasonable assurances that EchoStar's Agreement with Globe Star had expired.

The second reason EchoStar's burden-shifting argument fails is that DIRECTV actually had confirmation from EchoStar in the form of e-mails between EchoStar and Dumas in which EchoStar executives acknowledge that the Agreement had expired.  Furthermore, it is undisputed during the period in which EchoStar executives were operating as if the Agreement had expired on January 1, 2006, they had forgotten about Thompson's March 3, 2005, renewal request letter. If EchoStar didn't know (or remember, as the case may be) its Agreement with Globe Star had been extended to January 1, 2008, the idea that DIRECTV could somehow be held responsible for knowing it strains credulity.

After carefully reviewing all the evidence, this Court is convinced that "there is no genuine issue of material fact" regarding whether, when DIRECTV began communicating with Globe Star about Mega Cosmos in 2006, it was aware that EchoStar had an ongoing Agreement with Globe Star.  Hence, EchoStar's claim for tortious interference must fail as a matter of law. Even after drawing all reasonable inferences in its favor, this Court is not persuaded that "reasonable jurors could find by a preponderance of the evidence" that [EchoStar] is entitled to a verdict."  *Anderson*, 477 U.S. at 252.  Accordingly, DIRECTV's Motion for Summary Judgment is GRANTED.

**SO ORDERED.**

s/ Susan D. Wigenton
**Susan D. Wigenton, U.S.D.J.**

12